54 S.W.3d 499 (2001)
In the Interest of N.K. and D.T.K., Children.
No. 06-00-00124-CV.
Court of Appeals of Texas, Texarkana.
Submitted August 2, 2001.
Decided August 16, 2001.
Rehearing Overruled September 18, 2001.
*500 David C. Turner, Jr., Jana Turner, Turner, Meehan & Porter, LLP, Bonham, for appellant.
Meredith B. Parenti, Office of the Attorney General, Assistant Solicitor General, Austin, for appellee.
*501 Before CORNELIUS, C.J., GRANT and ROSS, JJ.

OPINION
Opinion by Chief Justice CORNELIUS.
Casey Kenyon appeals from a district court judgment terminating her parental rights to her children, N.K., now four and one-half years of age, and D.T.K., now three years of age. In two points of error, Mrs. Kenyon urges this Court to adopt a heightened standard of appellate review for parental termination cases, and challenges both the legal and factual sufficiency of the evidence to support the court's ruling. In light of previous precedents from this and other appellate courts across the state, we will not adopt the intermediate standard advocated by Mrs. Kenyon, and because we find the evidence is legally and factually sufficient to support the trial court's findings, we affirm the judgment.
In November 1998, Fannin County Child Protective Services (CPS) received a referral alleging that Mrs. Kenyon and Damien Kenyon, the children's father, were physically neglecting and emotionally abusing their children, N.K. and D.T.K. The referral specifically alleged that N.K., then two and one-half years of age, exhibited bruising and had been locked in a closet by his mother and father; Zachary, the eldest of the Kenyons' children, had missed twenty-three days of school; the children would go for days without food; they were often unsupervised; they had a history of severe diaper rash; and both the Kenyons used illegal drugs. CPS received a subsequent referral a few weeks later, with similar allegations, as well as new allegations that Mrs. Kenyon left the children with their father, who could not adequately care for them, for as long as ten hours, during which time the children were not fed properly, and that she would bring crack cocaine home to Mr. Kenyon. During the CPS investigation, the Kenyons admitted they abused drugs and needed assistance. Ronald Hamilton, a CPS investigator, found little evidence to substantiate some of the allegations, but he did determine that Mrs. Kenyon allowed the children to run around the house unsupervised while she slept.[1] Further, Debra Funtez, the court-appointed special advocate, also investigated the Kenyon family and determined they were in "great turmoil" because of the parents' drug abuse. Mrs. Funtez recommended termination of Mrs. Kenyon's parental rights, opining that she was unable to care for the children and likely would not be able to do so in the foreseeable future. Mrs. Funtez also observed that N.K. suffered from various insecurities, feelings of abandonment, and night terrors.
The Kenyons subsequently agreed to a service plan,[2] but CPS received two additional referrals in early January. First, Zachary apparently did not return to school until a few days after the Christmas break. Second, the Kenyons left the children with a sitter, for over twenty-four hours without sufficient food or water, while purportedly attending a job interview. At this point, CPS representatives picked up the children and placed N.K. and D.T.K. with their paternal grandmother. On January 8, four days after first *502 leaving the children with the sitter, the Kenyons visited the CPS office and admitted they had not been on a job interview, but rather on a "drug binge." N.K. and D.T.K. were ultimately placed in foster care. Mrs. Kenyon was unable to make satisfactory progress on her service plan because her community supervision for a criminal conviction was revoked in May 2000, and she was sentenced to ten years in prison.[3]
In March 1995, Mrs. Kenyon was sentenced to ten years' confinement, probated, for engaging in organized criminal activity in connection with her burglary of a habitation. Sometime during 1997 or 1998, she tested positive for marihuana and cocaine, at which time the State moved to revoke her community supervision. Mrs. Kenyon's community supervision was subsequently modified to require her placement at a Substance Abuse Felony Punishment Facility (SAFPF). She completed the first phase of the drug treatment program at the SAFPF, but failed to complete the second phase at the Salvation Army treatment center in Dallas.[4] She was terminated from the program for leaving the facility without permission. This conduct led to the revocation of her community supervision and the reinstatement of her ten-year prison sentence.
Before placing N.K. and D.T.K. in foster care, CPS representatives investigated the possible placement of the children with their maternal grandmother, Sheila Jacobs. However, because of a history of sexual abuse in Jacobs' home, the family's apparent nonchalant attitude toward such abuse,[5] and the concern that Mrs. Jacobs might return the children to the Kenyons, CPS determined that such placement was not an option.
Section 161.001 of the Texas Family Code governs the involuntary termination of the parent-child relationship. Pursuant to that section, a court may order termination of the parent-child relationship if it finds by clear and convincing evidence one or more of the statutory grounds set out in Section 161.001(1), and determines that termination is in the best interest of the child as required by Section 161.001(2). See Tex. Fam.Code Ann. § 161.001 (Vernon 1996). Here, CPS alleged that termination was proper under Section 161.001(1)(D) and (E). Subsection (1)(D) allows termination where the parent knowingly places or knowingly allows the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. See TEX. FAM.CODE Ann. § 161.001(1)(D). Subsection (1)(E) allows termination where the parent engages in conduct or knowingly places the child with persons who engage in conduct that endangers the physical or emotional well-being of the child. Tex. Fam.Code Ann. § 161.001(1)(E). In its findings of fact and conclusions of law, the trial court found that termination was proper under both Subsections 1(D) and (E). The court also found termination to be in N.K.'s and D.T.K.'s best interests.
Rights that inure in the parentchild relationship are of constitutional dimensions. *503 Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); In re G.M., 596 S.W.2d 846 (Tex.1980); In re J.J., 911 S.W.2d 437, 439 (Tex.App.-Texarkana 1995, writ denied). A parent's right to the parent-child relationship is "essential," "a basic civil right of man," and "far more precious than property rights." Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Because the involuntary termination of parental rights is complete, final, and irrevocable, trial court proceedings ordering termination must be strictly scrutinized. Holick v. Smith, 685 S.W.2d at 20; In re J.J., 911 S.W.2d at 439.
For that reason, and because termination of parental rights is such a drastic remedy, the proof required to support a termination order is elevated from a preponderance of the evidence to clear and convincing evidence. Tex. Fam.Code Ann. § 161.001; In re G.M ., 596 S.W.2d at 847; In re King, 15 S.W.3d 272, 275 (Tex. App.Texarkana 2000, pet. denied). The clear and convincing standard is an intermediate standard, falling between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. It requires "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007 (Vernon 1996); In re G.M., 596 S.W.2d at 847; In re King, 15 S.W.3d at 275.
Citing Spangler v. Texas Dep't of Protective and Regulatory Servs., 962 S.W.2d 253 (Tex.App.-Waco 1998, no pet.), Edwards v. Texas Dep't of Protective and Regulatory Servs., 946 S.W.2d 130 (Tex. App.El Paso 1997, no writ), and Neiswander v. Bailey, 645 S.W.2d 835 (Tex. App.Dallas 1982, no writ), Mrs. Kenyon contends that this heightened quantum of proof at trial requires that the appellate court reviewing an order of termination use a corresponding intermediate standard of review. See Spangler v. Texas Dep't of Protective Servs., 962 S.W.2d at 257; Edwards v. Texas Dep't of Protective Servs., 946 S.W.2d at 137; Neiswander v. Bailey, 645 S.W.2d at 836. However, on two prior occasions, In re King and In re J.J., we have declined to apply this intermediate standard of appellate review, relying on the unambiguous directive of the Texas Supreme Court in Meadows v. Green, 524 S.W.2d 509, 510 (Tex.1975), which expressly rejected the use of this intermediate standard. In re King, 15 S.W.3d at 275; In re J.J., 911 S.W.2d at 439-40.[6] In doing so, we join eight of our sister courts of appeals.[7] We will continue to use the traditional appellate review standard in these kinds of cases unless the Texas Supreme Court changes its explicit ruling in Meadows v. Green, 524 S.W.2d 509, 510 (Tex.1975).
Findings of fact entered in a case tried to the court have the same force and *504 dignity as a jury's answers to jury questions. Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex.1991). The findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex.1996); Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex.1994).
When presented with legal and factual sufficiency challenges, we first review the legal sufficiency of the evidence. Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex.1981) (per curiam). In determining a no-evidence point, we consider all of the evidence in the light most favorable to the party in whose favor the judgment has been rendered and indulge every reasonable inference from the evidence in that party's favor. Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998) (op. on reh'g); Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). We uphold the fact finder's determination if any probative evidence supports it. ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997). In conducting a factual sufficiency review, we view all the evidence and will sustain a factual sufficiency challenge only if we conclude that the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996).
Evidence at trial showed that Mrs. Kenyon not only had a substance abuse problem with, at least, crack cocaine, but also that she would bring cocaine home to her husband while he was watching N.K. and D.T.K. The evidence also demonstrated that Mrs. Kenyon left her children with a sitter, and subsequently with CPS, for over four days without ample food and clothing while she was admittedly on a drug binge. Additionally, it was shown that her community supervision had been revoked, and she had been sentenced to ten years in prison for her drug possession and use.
Based on these facts, the trial court could have reasonably concluded that Mrs. Kenyon engaged in conduct warranting termination of her parental rights to N.K. and D.T.K. Although there is little evidence that she committed any direct physical or emotional abuse of the children, the court could nevertheless have found that her conduct jeopardized the children's well-being. In order for parental conduct to constitute endangerment of the children's well-being, the conduct need not be directed at the children and the children need not actually suffer injury. Rather, endanger means to expose to loss or injury, to jeopardize. Boyd v. Texas Dep't of Human Servs., 715 S.W.2d 711, 715 (Tex.App.-Austin 1986), rev'd on other grounds, 727 S.W.2d 531 (Tex.1987). Further, the specific danger to the children's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. Id. at 533; In re King, 15 S.W.3d at 276-77; In re J.J., 911 S.W.2d at 440. Evidence of a parent's imprisonment may also contribute to a finding that the parent engaged in a course of conduct that endangered the children's physical and emotional well-being. In re Boyd, 727 S.W.2d at 534.
Here there is evidence, not only of Mrs. Kenyon's imprisonment, but also that her conduct placed her children in serious risk of both physical and emotional abuse. Julie Ann Ford, N.K. and D.T.K.'s foster mother, testified that at the age of two and one-half years, N.K. exhibited a fear that the "[p]olice were after him" and that he had to "[h]ide the drugs." Mrs. Ford also *505 testified that N.K. would pick up pieces of paper off the ground, roll them up, and ask her other children if they wanted a "joint" to "get high." Finally, Mrs. Ford testified that N.K., while having his diaper changed, would point to his penis saying, "Suck my D-I-C-K" or gyrate his hips in an upward thrusting motion saying, "Hump, hump, want to hump, are you going to touch me there?"[8] At the time referenced by Mrs. Ford, D.T.K. was still an infant and could not yet speak. In light of this evidence, we cannot say that the trial court erred in finding that Mrs. Kenyon knowingly placed the children in conditions that endangered their physical and emotional well-being. In addition, the trial court could have reasonably concluded that by persistently engaging in illegal conduct, such as using crack cocaine, Mrs. Kenyon knowingly engaged in conduct that endangered the physical and emotional well-being of her children.
Furthermore, the trial court did not err in finding there was clear and convincing evidence that terminating Mrs. Kenyon's parental rights was in the children's best interests.[9] Although Mrs. Kenyon has allegedly been released from prison and placed on community supervision, she is likely to remain on community supervision for ten years, and her past conduct indicates that she had difficulty complying with the terms of her community supervision, especially abstinence from illegal drug use. These facts, coupled with the young age of her children, make the case for parental rights termination quite compelling. Mrs. Funtez testified that the relative youth of the boys made them more adoptable, and because they had been in a foster home since the ages of two and one, the transition from foster care to adoption by the foster parents would be less tumultuous. Moreover, according to Mrs. Ford, N.K. is extremely concerned about where he is going to "be forever," and has told her, "Mommy, I love you, I want to stay here, I don't want to leave."[10],[11]
Considering the evidence as a whole, it greatly preponderates in favor of the trial court's findings. Thus, the trial court's *506 findings are not so against that great weight and preponderance of the evidence as to be clearly wrong and unjust.
For the reasons stated, we affirm the judgment of the trial court.
Concurring Opinion by Justice GRANT.
I am aware that this court has refused to follow the clear and convincing standard of review in a number of prior cases, that the Texas Supreme Court refused to follow that standard to determine whether a party was actuated by malice in Meadows v. Green, 524 S.W.2d 509 (Tex.1975), and I realize that a majority of courts of appeals have also refused to follow that standard of review. However, it is inconsistent to require a jury to decide a case on one standard and then review it on a different standard. Furthermore, because the Legislature has set forth the standard in the Texas Family Code for the termination of parental rights, I see no reason why the appellate courts cannot follow that standard in reviewing this type of case for sufficiency of evidence.
I concur with this opinion because the Texas Supreme Court has directed us not to review by using a clear and convincing standard, but I urge the Texas Supreme Court to reconsider its ruling on this matter.
NOTES
[1] The record reflects that Mrs. Kenyon had previously left one of her children unsupervised while she slept, and the police found her eldest child, Zachary, then two years old, in the street by himself.
[2] The plan required the Kenyons to: attend parenting and anger management classes, participate in marital counseling, attain stable employment, find and maintain adequate housing, submit to psychological evaluations, pay child support, and submit to random drug testing.
[3] The terms of Mrs. Kenyon's sentence required a hearing after 180 days of incarceration to determine whether she should be placed on shock probation. Although the record is unclear as to the results of this hearing, Mrs. Kenyon's appellate counsel maintains that she received shock probation and is now living and working in Bonham, Texas.
[4] This second phase was held at an unsecured facility.
[5] The family apparently made no effort to keep the children away from the sexual abuser, Mrs. Jacobs' father, when he visited and allowed the eldest boy, Zachary, to travel with him.
[6] See also Slatton v. Brazoria County Protective Servs. Unit, 804 S.W.2d 550, 555-56 (Tex. App.Texarkana 1991, no writ).
[7] See, e.g., In re D.T., 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2000, no pet.); Leal v. Texas Dep't of Protective & Regulatory Servs., 25 S.W.3d 315, 319 (Tex.App.-Austin 2000, no pet.); In re K.C.M., 4 S.W.3d 392, 395 (Tex.App.-Houston [1st Dist.] 1999, pet. denied); In re M.D.S., 1 S.W.3d 190, 194 (Tex. App.Amarillo 1999, no pet.); In re K.M.M., 993 S.W.2d 225 (Tex.App.-Eastland 1999, no pet.); In re B.S.T., 977 S.W.2d 481, 484 (Tex. App.Houston [14th Dist.] 1998, no pet.); In re J.F., 888 S.W.2d 140, 141 (Tex.App.-Tyler 1994, no writ); In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.-Corpus Christi 1994, no writ).
[8] Although there appears to be no direct evidence of how or where N.K. learned these crude sexual-and drug-related phrases, the trial court was well within its discretion to reasonably infer that since neither N.K. nor D.T.K. spent any meaningful time outside of Mrs. Kenyon's custody, N.K. was simply emulating the language and behaviors he witnessed at home.
[9] The Supreme Court of Texas has provided a nonexclusive list of factors for the fact finder to consider when ascertaining the best interest of a child:

(a) the desires of the child;
(b) the present and future emotional and physical needs of the child;
(c) the present and future emotional and physical danger to the child;
(d) the parenting abilities of the individuals seeking custody;
(e) the programs available to assist these individuals to promote the best interests of the child;
(f) the plans for the child by these individuals or by the agency seeking custody;
(g) the stability of the home or proposed placement;
(h) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and
(i) any excuse for the acts or omissions of the parent.
Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976)
[10] Ford testified that she and her husband are interested in adopting both N.K. and D.T.K.
[11] The need for permanence is the paramount consideration for the children's present and future physical and emotional needs. The goal of establishing a stable, permanent home for a child is a compelling interest of the government. In re S.H.A., 728 S.W.2d 73, 92 (Tex.App.Dallas 1987, writ ref'd n.r.e.). The threat of present or further incarceration makes Mrs. Kenyon's future uncertain.